**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT BOWLING GREEN**

**UNITED STATES OF AMERICA**                                    **PLAINTIFF**

**v.**                                    **CRIMINAL ACTION NO.  1:06-CR-48**
                                          *Filed Electronically*

**KALEN W. WATKINS, et. al.**                                    **DEFENDANT**

**UNITED STATES' SENTENCING MEMORANDUM FOR KALEN W. WATKINS,**
**LAURA LEIGH WELLS, TYRONE TACKETT AND CURTIS HOPKINS**

The United States of America, by counsel, submits the following sentencing memorandum

for Kalen W. Watkins, Laura Leigh Wells, Tyrone Tackett, and Curtis Hopkins.[1]

**FACTS**

Kalen Watkins was Fruit of the Loom's (FoL) Environmental Director.  As FoL's

Environmental Director, Watkins was entrusted to determine which environmental projects needed

to be completed, setting the budgets for those projects, hiring contractors to complete projects, and

approving invoices submitted by those contractors for payment.

In 1998 or 1999, Watkins devised a scheme to defraud FoL.  Although Watkins' scheme was

simple to understand, its execution was sophisticated and complex in its breadth.  FoL relied on

Watkins' environmental expertise.  Watkins' determined that he could set FoL's environmental

budget far higher than necessary to complete the required work.  He also determined that he could

hire his friends and colleagues to do the environmental work for FoL, and because he approved

FoL's budget and invoices for payment, he could tell his co-conspirators how much to bill, even if

---

[1] Defendants Kenneth Scott Harris and Ronald Pollock have both moved to continue their sentencing hearings.  The United States will file sentencing memoranda for Harris and Pollock within two weeks of their sentencing hearings.

the project cost far less to complete.  In return for FoL business, Watkins' friends and colleagues kicked back significant portions of their profits to Watkins.  In addition to approving inflated invoices for payment, Watkins also approved invoices for payment even though he knew that absolutely no work was performed.  People who refused Watkins' offer to participate in the scheme were cut off from future FoL projects until they agreed to participate.

### Terry Pool Rejected Watkins' Proposal to be a Silent Partner in SCS

In 1998, Terry Pool (Pool) owned a company called SCS Environmental (SCS) that had a few minor projects with FoL.  Watkins approached Pool with a business proposal.  Watkins told Pool that FoL had budgeted millions to perform upcoming environmental projects, but that the projects would cost much less to actually complete.  Watkins offered to hire SCS to do the work on those projects, and told Pool that SCS could bill the budget, resulting in large, windfall profits.  In return, Watkins wanted to be a silent partner in SCS, thus allowing him to share SCS's profits, and asked that SCS hire Watkins' mistress, Laura Wells.  Pool rejected Watkins' offer, and for several years SCS received no further FoL business.

### Scott Harris Accepted Watkins' Proposal to be a Silent Partner in RMG

In mid-1998, Scott Harris (Harris) formed Risk Management Group (RMG).  During a February 2006 interview with the FBI, Harris explained that he had known Watkins for some time, and that in 1998 Watkins encouraged Harris to leave his employer and to start his own environmental consulting company, and that Watkins promised to send Harris FoL business.  Whereas Pool had rejected Watkins' proposal to defraud FoL, Harris accepted.   Harris started RMG and hired Laura Wells, and Watkins became a silent partner in RMG.

As promised, Watkins hired RMG to perform several environmental projects for FoL. RMG performed the work, but with Watkins' approval, overbilled for the work it performed. In 1999 alone, RMG received over $1,000,000 from FoL[2] and Watkins and Harris shared over $300,000 in profits from their fraudulent scheme.

### Scott Harris Paid Kickbacks to Kalen Watkins in Return for FoL Business

Tyrone Tackett (Tackett) owned Cyclone, a heavy equipment company. Tackett testified at trial that in 1999 Watkins and Harris approached him about using Cyclone to launder money generated from their fraudulent scheme, and Tackett agreed. By laundering funds through Cyclone, the source and ownership of the funds were disguised, and RMG could also fraudulently claim any payments to Cyclone as business expenses on its tax returns.[3] On April 1, 1999, RMG gave Cyclone a check for $97,095. Tackett testified that he performed no work in return for this check. Tackett deposited the check and gave approximately $85,000 back to Watkins. On June 1, 1999, RMG gave Cyclone another check for $53,540, purportedly for work on FoL's Rockingham, North Carolina jobsite. Tackett testified that he did no work for this check, and that he has never stepped foot in Rockingham, North Carolina. Tackett testified that he gave Harris all of the proceeds of this check.

Ron Pollock owned Pollock & Associates (P&A). Pollock testified that in 1999 Harris and Watkins approached him about using P&A to launder money generated by their fraudulent scheme,

---

[2]    RMG received approximately $50,000 in 1999 for work performed on behalf of clients other than FoL.

[3]    Harris had over $100,000 in cash deposits in his personal bank account in 1999, and withdrew an additional $130,000 from RMG's account in late 1999, when RMG closed its doors. In addition, in June 1999 alone Harris paid $68,893.44 to GMAC Mortgage, and sent $60,000 to Merrill Lynch. Harris also sent $94,000 to Ameritrade in April 2000. RMG's 1999 tax return nonetheless reported an operating loss of approximately $24,000, and Harris claimed approximately $50,000 in income on his 1999 personal tax return.

and Pollock agreed.  On April 20, 1999, Harris gave Pollock a $74,912 RMG check made payable to P&A.  Pollock testified that he had done between $5,000 and $7,000 of actual work for RMG, and the remainder of the check was completely unearned.  Pollock testified that he deposited the check and withdrew portions of the funds each week in cash, and gave that cash to Harris.  On June 23, 1999, P&A received another $8,400 check from RMG.  Pollock testified that he did no work in return for this check, and that he cashed the check and gave the funds back to Harris.  On June 28, 1999, P&A received another check from RMG, for $9,250.  Pollock testified that he did no work in return for this check, and that he cashed the check and gave the funds back to Harris.  Pollock's bank records reflecting cashed checks and cash withdrawals correspond directly with large cash deposits made in Harris' personal bank account.

Harris also paid Watkins other kickbacks in addition to Watkins' share of the bogus checks RMG laundered through Cyclone and P&A.  In late 1999, Harris' wife, Deborah Harris, purchased two cashier's checks, one for $18,650, and the other for $30,000, made payable to Watkins' wife, Lori Watkins.  These checks were additional kickbacks to Watkins.  At trial, Watkins and Harris both testified that these checks represented Harris' purchase of a lifetime lease to hunt and fish on Watkins' farm.  This story was demonstrably false, because Harris was unable to explain the purpose of the checks when he was interviewed in February 2006 and again in April 2006, and there was absolutely no documentation of this alleged lifetime lease.[4]  Moreover, this alleged purchase of a lifetime lease made no sense because Harris' wife does not work, and in late 1999 RMG was closing its doors, and Harris was preparing to move his family over 700 miles away to Oklahoma so he could

---

[4]  At trial, Harris was asked on cross if he had anything documenting his alleged lifetime lease.  Harris bluffed and said his attorney had the written agreement, but when he was asked to produce the agreement, he was unable to do so.

obtain his PhD at Oklahoma State University.  During his February 2006 interview, Harris also admitted that on more than twenty (20) but less than fifty (50) occasions, he paid Watkins $1,000 to $2,000 in cash kickbacks.

### The Fraud Continued When Harris Moved to Oklahoma

Harris and Watkins continued their scheme to defraud FoL even after Harris closed RMG and move to Oklahoma.  On September 7, 2001, Harris received an email from Watkins titled "lotto," in which Watkins instructed Harris to bill FoL $28,561 for purchase order 186542.  In the email, Watkins listed the following 3 line items:

7–ex

10k, csh

11561s

During his February 2006 interview with the FBI, Harris confessed that this email outlined the continuing scheme to defraud FoL.  Harris explained that the project was expected to cost $7,000 in expenses (7-ex), that Kalen would receive a $10,000 cash kickback (10k, csh), and  the remaining $11,561 would go to Scott (11561s).  In fact, Harris submitted a $28,771 invoice to FoL for purchase order 186542, and Harris explained that he paid Watkins his cash kickback in December 2001, when Harris and his family returned to Bowling Green for the Christmas holiday.  Watkins personal bank records reflect a $7,880 cash deposit on December 21, 2001.

### Watkins Convinced Terry Pool to Overbill FoL and to Pay Kickbacks

In late 2000 or early 2001, Watkins again approached Pool and SCS with an offer to do work for FoL.  At first, Pool thought his new work with FoL would be completely legitimate, and SCS submitted a cost proposal to FoL for a project in Jackson, Mississippi.  Watkins travelled to Jackson

to visit with Pool, and had SCS's cost proposal with him.  Watkins increased the price for each of

the line items in SCS's proposal and told Pool to resubmit the proposal with the increases.  Watkins

told Pool that SCS would receive bogus invoices for the amount of the overcharges, and that Pool

should pay them.  Pool initially refused to resubmit the proposal, but Watkins threatened to withdraw

the contract, and SCS and the Pool family were struggling financially at the time.  Ultimately, Pool

agreed and SCS resubmitted its cost proposal with increased costs for each line item.

When FoL began mailing Pool payments for SCS's performance of the project, Pool began

receiving bogus invoices.  Over time, Pool received and paid the following bogus invoices, even

though no work was performed in return for the payments:[5]

| Company Sending Invoice to SCS | Date of Invoice | Amount Billed on Invoice and Paid by SCS |
| --- | --- | --- |
| Cyclone, owned by Tackett | January 24, 2001 | $40,048 |
| Environmental Technology Associates (ETA), owned by Laura Wells | May 21, 2001 | $40,110 |
| Cyclone | September 18, 2001 | $58,400 |
| ETA | January 8, 2002 | $10,700 |
| ETA | January 31, 2002 | $25,000 |
| ETA | March 21, 2002 | $25,000 |

---

[5] At Harris' trial, Pool testified that he did not benefit from the scheme, other than receiving his normal rate for the project, because all of the overpayments he received from FoL were sent back to Watkins through SCS's payment of the bogus invoices submitted to SCS by Cyclone and ETA. The amounts on the bogus invoices matched the amount that FoL was overpaying, based on Watkins' markup of SCS's cost proposal.

**<u>Watkins and Wells Defrauded FoL of Hundreds of Thousands of Dollars at Martin Mills</u>**

Watkins subsequently approached Pool about another FoL contract in Martin Mills, Louisiana.  Watkins told Pool that several hundred thousand dollars were going to be budgeted for the project, which required the cleaning of lime ponds, among other things.  Watkins told Pool that he could bill the budget, but instead of properly cleaning the lime ponds, he could just skim a layer of lime off the top (so a sample could be provided to a testing lab for FoL's records) and backfill the ponds with dirt.  Watkins expected that this would cost about $50,000.  Watkins again suggested that he would be a silent partner in SCS, and that he would share the hundreds of thousands of dollars of profits.  Pool refused.

In January 2002, Watkins hired ETA, owned by his mistress, Laura Wells,[6] to perform the FoL contract at Martin Mills, Louisiana, accepting ETA's $375,000 bid.  Wells testified before the grand jury that prior to being awarded the project, Wells and Watkins discussed using the profits from the project to buy land.  Wells also told the grand jury that she was working on her graduate degree at the University of Louisville at the time of the Martin Mills project, and that she never even went to Louisiana during the course of the project.  Records reflect that ETA paid $221,614 to contractors working at the Martin Mills jobsite.  On the other hand, FoL records show that Watkins' convinced FoL to increase the budget for the project, and that FoL paid ETA $610,640 for the project, resulting in a profit of nearly $390,000.  In other words, ETA's profit margin was nearly 64%.  On May 31, 2002, in accordance with the scheme, ETA and Wells purchased land titled in Watkins' name for over $280,000.

---

[6]    Watkins is married and has several children with his wife.  He also has three children with Wells.

In late 2003, ETA received a grand jury subpoena for documents related to work with FoL. As Wells admitted in her grand jury testimony, in response to the subpoena, Wells and Watkins fabricated a February 2002 $605,000 bid proposal from ETA to FoL for the Martin Mills project. This bid proposal did not exist. Moreover, Wells had Pollock create false invoices to ETA to give the appearance that there were additional expenses related to the project. Explaining her obstruction, Wells told the grand jury that "I knew I had made a large profit on the project and–you know, I just thought it looked really bad."

### Pollock and Watkins Defrauded FoL

In addition to laundering funds for Watkins and Harris through the receipt of RMG checks, as described above, Pollock also defrauded FoL by submitting inflated and bogus invoices directly to FoL. Watkins knew these invoices were inflated or completely bogus, but he approved them for payment and shared the profits with Pollock. During a proffer, Pollock admitted that he received payment for $160,675 in completely bogus invoices submitted to FoL, and that he shared the profits from these invoices with Watkins. Pollock also admitted that he received an additional $15,000 from FoL for invoices that were fraudulently inflated. These overpayments were also shared with Watkins.

### Curtis Hopkins and Watkins Defrauded FoL

In late 2001 FoL wanted to find a new coal supplier for its plant in Jamestown, Kentucky. FoL's supplier at the time, R&L Mining, had offered to sell high quality, less than 1% sulfur coal to FoL for $46 per ton, but FoL wanted a new supplier because FoL suspected that R&L was improperly disposing of coal ash.

Andy Watkins (Andy) is Kalen Watkins' cousin. Andy was a former coal broker, and Kalen asked Andy if he knew of any potential new suppliers for FoL. Andy introduced Kalen to Curtis Hopkins (Hopkins), who owned Cobra Coal. Hopkins, Andy and Kalen all met in a Shiloh's restaurant in Somerset to discuss the contract. Hopkins agreed to pay kickbacks to Kalen in return for the FoL coal contract, but Hopkins thought Andy should receive something in return for introducing the parties. Kalen told Hopkins he could pay Andy as long as it did not come out of his kickbacks.

Watkins wanted to award the contract to Hopkins, but he had to obtain other bids to make the bid process appear legitimate. Hopkins visited his business neighbor, Trey Zimmerman (Zimmerman), who owned Blue Star Energy. Hopkins told Zimmerman that he was probably going to get a contract to supply coal to FoL, but that FoL needed additional bids. Hopkins knew that Zimmerman could not compete with his price, because Hopkins was offering 1.9% sulfur coal to FoL, whereas Blue Star had only less than 1% sulfur coal to offer for sale.[7] Zimmerman agreed to submit a bid.

FoL received two bids. Blue Star bid $52.00 per ton for less than 1% sulfur coal, and Hopkins bid $46 per ton for less than 1.9% sulfur coal. Hopkins was awarded the contract. Evidence introduced at trial showed that Hopkins purchased his coal for $34 per ton. Several witnesses testified at trial that the normal mark-up for coal is between $2 and $3 per ton, and that a $5 per ton markup is unusually large. Hopkins and Watkins charged FoL a $12 per ton markup.

---

[7] All other things being equal, the lower the sulfur content, the better quality the coal, and the more expensive the coal. During trial, several witnesses testified that comparing the price of 1% coal to the price of 1.9% coal is like comparing apples and oranges. They also testified that 1% coal is more expensive.

From February 2002, through April 2002, Hopkins paid $13,659.52 to Andy Watkins as a finder's fee.[8]  Beginning in May 2002, Hopkins stopped paying Andy Watkins and began sending thousands of dollars to Laura Wells.  When interviewed by the FBI, Hopkins claimed that he owed Andy Watkins $2 per ton in commissions as a result of Andy's involvement in the contract.  Hopkins told the FBI that at some point, Andy telephoned him and told him that he owed Kalen Watkins money, and that he wanted Hopkins to send his commissions to Kalen Watkins to repay the debt.  Because Kalen worked for FoL and payments from Hopkins to Kalen might appear improper, Hopkins claimed that Andy told him to send his commissions to Kalen through Laura Wells.  Later, Hopkins changed his story and told the FBI that Kalen had called him and ordered him to start sending the payments to Wells.  At trial, Andy Watkins testified that he was only entitled to payments to Metal Works as a finder's fee, and that he never had a telephone conversation with Hopkins about any payments to Laura Wells, because he was not owed anything further.

Wells testified at trial that Kalen Watkins had told her that she would soon begin receiving payments from Cobra Coal, and that she should send an invoice to Cobra Coal *after* receipt of the checks.  Kalen Watkins never told Wells that Andy owed him money, or that the payments were alleged commissions owed to Andy Watkins.  Due to her previous dealings with Kalen, Wells assumed that the checks were part of another kickback scheme.

From May 2002 through August 2003, Hopkins sent $51,288.60 to Wells.  These payments represented the kickbacks the parties agreed to during the meeting at Shiloh's restaurant.  At first, Hopkins sent the checks to ETA.  However, Wells told Kalen Watkins that she did not want the

---

[8]    These payments were actually made on Andy's behalf to a company called Metal Works, which was building a canopy on Andy Watkins' restaurant.

checks made payable to ETA, because she would have to pay taxes on the payments. She told Kalen to tell Hopkins to send the checks to her personally. Hopkins, however, did not want to send the checks to Wells personally, because he wanted to claim the kickbacks as expenses. Accordingly, he began sending the checks to Laura Wells Consulting (LWC). Wells testified at trial that she had never heard of LWC, and the first time she ever heard of LWC was when she received a check from Cobra Coal. In the memo section of several of the checks, Hopkins wrote that the checks were for consulting services. Evidence at trial showed that Hopkins told his tax preparer that the payments to ETA and LWC were for chemical and coal analysis. Wells testified at trial that she had never met Hopkins and had never provided any services in return for the checks.

Contrary to Hopkins' claim to the FBI that he was paying a $2 per ton commission, a review of the records reflects that Hopkins payments fluctuated wildly, from between less than $2 per ton to over $8 per ton, and averaged well over $4 per ton. Moreover, Kalen Watkins was fired in September 2003. Hopkins delivered over twelve thousand tons of coal to FoL after Kalen Watkins was fired, but never sent a single penny in commissions to anyone after Kalen was fired.

## SENTENCING RECOMMENDATIONS

### I.    Kalen W. Watkins

Watkins abused his position of trust to organize and lead a sophisticated, seven figure fraud. In paragraph 11 of his plea agreement Watkins agreed to be sentenced under the Guidelines. Accordingly, the United States respectfully requests a Guideline sentence of at least 151 months of imprisonment.

Watkins' loss amount is $1,112,601.44, calculated as follows:

| | | |
|---|---|---|
| 4/1/1999 bogus RMG payment to Cyclone | | $97,095 |
| 6/1/1999 bogus RMG payment to Cyclone | + | $53,540 |
| 4/27/1999 bogus RMG payment to Pollock (-$7,000 for work Pollock actually performed) | + | $67,912 |
| 6/23/1999 bogus RMG payment to Pollock | + | $8,400 |
| 6/28/1999 bogus RMG payment to Pollock | + | $9,250 |
| 2 kickback cashier's checks purchased by Debbie Harris and made payable to Lori Watkins | + | $48,650 |
| thirty five (35) $1,500 cash kickbacks to Watkins from Harris | + | $52,500 |
| Lotto email fraud ($28,771 paid - $7,000 expenses) | + | $21,771 |
| 1/24/2001 bogus SCS payment to Cyclone | + | $40,048 |
| 9/18/2001 bogus SCS payment to Cyclone | + | $58,540 |
| 2001 and 2002 bogus SCS payments to ETA | + | $121,295 |
| Completely bogus invoices Pollock submitted to FoL | + | $160,675 |
| Partially bogus invoices Pollock submitted to FoL | + | $15,000 |
| Overbilling for coal from Cobra Coal | + | $122,285.44 |
| Martin Mills overpayments to Laura Wells | + | $235,640 |
| **TOTAL** | | **$1,112,601.44** |

12

The Probation Officer determined Watkins offense level to be 32, calculated as follows:

| | | |
|---|---|---|
| 2B1.1(a)(2)--base offense level | | 6 |
| 2B1.1(b)(1)(I)--loss over $1,000,000, less than $2,500,000 | + | 16 |
| 2S1.1(b)(2)(B)--money laundering, 18 USC 1956 | + | 2 |
| 3B1.1(a)--organizer or leader of criminal activity involving 5 or more | + | 4 |
| 3B1.3--abuse of position of trust | + | 2 |
| 3C1.1--obstruction of justice--perjury | + | 2 |
| | | 32 |

The United States agrees with the Probation Officer's loss calculation and the sentencing enhancements she applied, but objects to the extent the Probation Officer failed to include a two level enhancement for sophisticated means and failed to note, in paragraph 130, that an upward departure is appropriate as a result of Watkins' multiple attempts to obstruct justice.

**A.      Watkins Should Receive a Two Level Enhancement for Sophisticated Means**

A two level enhancement for sophisticated means applies when the offense involves "especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense."  Section 2B1.1, Application Note 8(B).  "A series of criminal actions may constitute sophisticated means even if none of the offenses, standing alone, is especially complex or especially intricate."  United States v. Masters, 2007 WL 438085, * 2 (6th Cir., Feb. 6, 2007) (unpublished) (citing United States v. Tandon, 111 F.3d 482, 491 (6th Cir. 1997)).

An enhancement for sophisticated means applies in this case due to the complex nature of Watkins' scheme.  Watkins had to analyze the environmental work FoL needed to be performed,

and he had to determine how much FoL could and would budget to complete the work.  Watkins next had to enlist qualified people to do the work, but those people also had to be willing to participate with him in the fraud.  Watkins then devised a scheme to receive kickbacks without being detected.

The key to the fraud was that in most instances, FoL's environmental work was completed by the co-conspirators Watkins hired.  FoL, therefore, had little reason to suspect it was being defrauded.  In fact, as explained by Terry Pool during Scott Harris' trial, Watkins instructed his co-conspirators to mark up the line item prices on their invoices to create extra income that could be shared with Watkins through illegal kickbacks.  Watkins also had to develop ways to receive his kickbacks without detection, so he arranged to have his kickbacks laundered by receiving them through multiple sources and in various forms.  Watkins received kickbacks in the form of checks written to his wife.  Watkins received kickbacks through payments made to his co-conspirator, Laura Wells, and fictional companies like Laura Wells Consulting.[9]  Watkins received cash kickbacks from Scott Harris, Ron Pollock, and Tyrone Tackett.  Watkins also became a silent partner in RMG with Scott Harris, was a de facto silent partner of ETA with Laura Wells, and tried unsuccessfully to become a silent partner in SCS with Terry Pool.  In fact, Watkins' concealment of his scheme was so effective, the fraud would not have been discovered if not for an anonymous tip to Crime Stoppers.  For all these reasons, a two level enhancement for sophisticated means applies.

---

[9]  Application Note 8(B) of section 2B1.1 states that "conduct such as hiding assets or transactions, or both, through the use of fictitious entities . . . ordinarily indicates sophisticated means."

14

**B.      An Upward Departure is Appropriate As a Result of Watkins' Multiple Attempts to Obstruct Justice**

Through his guilty plea to Count 6, Watkins admits that he obstructed justice in the fall of 2003 when he and Laura Wells created false documents in response to a grand jury subpoena, in an attempt to conceal the $235,000 Martin Mills fraud they perpetrated on FoL.  This obstruction properly results in a two level enhancement under section 3C1.1 of the Guidelines.

Watkins' obstruction continued in the fall of 2007 when he repeatedly perjured himself during Scott Harris' trial.  Harris called Watkins as a defense witness.  On direct, Watkins was asked to explain the lotto email, discussed above.  First, Watkins explained that "the term lotto meant that this was going to be a good deal for you (Harris).  You need the money and you can do a good job for Fruit."  Watkins then testified on direct that the three line items in the lotto email represented $7,000 in expenses, $10,000 for unknown expenses, and $11,561 for sampling, another expense.

On cross, the United States pointed out to Watkins and the jury that Watkins' testimony was patently false and nonsensical.  Watkins was asked how the term "lotto" could possibly mean that the job was "such a good deal for Harris" if, under Watkins' explanation, every cent of the project was allocated to expenses.  Backed into a corner by his own lies, Watkins completely changed his story and claimed that "lotto" meant that "it was a good deal for Fruit of the Loom."

Later in his cross examination, Watkins was asked about his August 24, 2007, offer to AUSA Weiser, three days before the start of Harris' trial, to testify against Harris in return for the United States' recommendation that Watkins' co-defendant and mistress, Laura Wells (Wells), receive no prison time.  Watkins admitted that he inquired about a potential agreement under which the United States would recommend that Wells receive no prison time.  Watkins falsely

15

denied, however, offering to testify against Harris in return.  Although Watkins admitted that there would have to be give and take between the parties to reach an agreement, he repeatedly denied offering anything to the United States in return for his request that Wells, who was involved in several hundred thousand dollars of fraud, receive no prison time.

Finally, Watkins testified on direct that "Scott Harris didn't do anything illegal with Fruit of the Loom," and that he was not involved in a kickback scheme with Harris.  The jury clearly found Watkins' testimony false, as evidenced by its unanimous verdict that Harris was guilty of conspiring with Watkins and others to defraud FoL.  Moreover, Watkins' perjured testimony is squarely contradicted by Harris' confession.

Although multiple instances of obstruction do not result in multiple two level enhancements under section 3C1.1, multiple attempts to obstruct justice do support an upward departure under sections 5K2.0, 5K2.7, and 5K2.9 of the Guidelines.  See United States v. Pulley, 922 F.2d 1283, 1289 (6th Cir. 1991) (affirming an upward departure in addition to a two level enhancement under 3C1.1 where the defendant committed perjury and convinced another witness to refute his confession, and convinced other witnesses to commit perjury).  Accordingly, the United States wishes to put the Court and the defendant on notice that it reserves the right to seek an upward departure based on Watkins' repeated and intentional efforts to obstruct justice.

**C.      Watkins' Objections to the PSR are Unsupported by Fact or Law**

Watkins objects to the inclusion of any losses relating to Scott Harris because "Watkins has denied engaging in any illegal activity with Harris."  First, a federal jury unanimously found beyond any reasonable doubt that Harris conspired with Watkins and others to defraud FoL.  Second, the reliability of Watkins' denial was eviscerated by his cross examination at the Harris

trial, through Scott Harris' confession, and through the trial testimony of Tyrone Tackett and Ronald Pollock. Third, the Guidelines make clear that all relevant conduct shall be considered when determining the appropriate offense level for sentencing. See Section 1B1.3.

Watkins next objects to the inclusion of losses relating to bogus Ron Pollock invoices he approved for payment, even though he knew no work had been performed. Again, Ron Pollock testified about these entirely bogus invoices during the Harris trial, and they are rightfully included as relevant conduct.

Watkins also objects to losses relating to Curtis Hopkins. These losses are properly included for the reasons stated above. Moreover, any agreement on restitution between the United States and Hopkins has no bearing on the total loss suffered by FoL as a result of Watkins' scheme.

Watkins objects to the inclusion of losses resulting from his Martin Mills scheme with Laura Wells. These losses are also relevant conduct and are proved by the straight forward facts, and by Watkins' admitted fabrication of documents in an attempt to hide the fraud when the project was being investigated.

Watkins objects because he was denied a reduction for acceptance of responsibility. As explained above, Watkins repeatedly perjured himself while testifying during Harris' trial. Application Note 1(a) to section 3E1.1 of the Guidelines states: "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." A unanimous jury found that Watkins' denials were false. Application Note 4 to section 3E1.1 states "conduct resulting in an enhancement under section 3C1.1 . . . ordinarily indicates that the defendant has not accepted

17

responsibility for his criminal conduct.  Moreover, in paragraph 10 of the plea agreement, the United States agreed to recommend a reduction for acceptance of responsibility only if "the defendant does not engage in future conduct which . . . constitutes obstruction of justice, or otherwise demonstrates a lack of acceptance of responsibility."

Watkins objects to a four level enhancement under section 3B1.1(a) for being an organizer or leader of criminal activity, because he "disagrees that five or more participants were involved."  This enhancement applies because Watkins clearly organized and led Laura Wells, Scott Harris, Ronald Pollock, Tyrone Tackett, Curtis Hopkins, and Terry Pool in the conspiracy to defraud FoL.  Watkins himself is a participant. See United States v. Carroll, 1996 WL 266425, *6 (6th Cir., May 17, 1996) (counting the defendant as a participant and holding "every circuit which has considered this question has concluded that the defendant counts as a participant within the meaning of § 3B1.1," citing cases from the First, Third, Fourth, Fifth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits).  Watkins has also pled guilty to conspiring with participants Wells, Pollock, Tackett, and Terry Pool.  Application Note 1 to section 3B1.1 makes clear that Pool counts as a participant even though he was not charged, because a "participant is a person who is criminally responsible for the commission of the offense, but need not have been convicted."  Finally, Harris is a participant based on his conviction for conspiring with Watkins and others, and Hopkins is also a participant, based on his guilty plea and the plain facts of the case.

**D.      Watkins Should be Sentenced in Accordance with His Plea Agreement**

In paragraph 11 of his plea agreement Watkins agreed to be sentenced pursuant to the Guidelines, and agreed that he would not argue for any other sentence.  Accordingly, the United

States requests that the Court enforce the plea agreement and sentence Watkins to a Guideline sentence of at least 151 months, the low end sentence for offense level 34 and criminal history category I. The United States also reserves the right to request an upward departure based on Watkins' perjury during the Harris trial.

## II.   Laura Leigh Wells

The United States has no objections to the Probation Officer's determination of Wells' offense level and criminal history. The United States anticipates making a 5K1.1 motion for substantial assistance so long as Wells accepts full responsibility for all of her illegal activities at the time of sentencing. If Wells does not fully accept responsibility for her actions, the United States will be unable to make a 5K1.1 motion, and will request a 30 month sentence, the low end of the applicable Guideline range.

Wells loss amount is $426,233.60, calculated as follows:

| | | |
|---|---|---|
| Payments received from Cobra Coal | | $51,288.60 |
| Payments from SCS for bogus invoices | + | $121,295[10] |
| Payment from Pollock | + | $18,000[11] |
| Martin Mills overbilling | + | $235,640 |
| | | $426,223.60 |

---

[10]   The United States was only able to locate $100,810 in bogus ETA invoices submitted to SCS, but SCS paid ETA $121,295. Terry Pool believes ETA submitted an additional invoice to SCS. Laura Wells does not believe an additional invoice was submitted to SCS, but acknowledges receiving $121,295 from SCS, and that she did no work for SCS.

[11]   At Watkins' instruction, Pollock gave Wells the proceeds from one of the bogus invoices he submitted to FoL.

Wells final offense level is 19, before any potential 5K1.1 reduction, calculated as follows:

| | | |
|---|---|---|
| 2B1.1(a)(2)–Base offense level | | 6 |
| 2B1.1(b)(1)H--Loss over $400,000, less than $1,000,000 | + | 14 |
| 3C1.1--Obstructing Justice (creating false documents in response to a grand jury subpoena) | + | 2 |
| 3E1.1(a) & (b) | - | 3 |
| | | 19 |

## II.    Tyrone Tackett

The United States has no objections to the Probation Officer's determination of Tackett's offense level and criminal history.  Tackett's Guideline range is 24 to 30 months imprisonment. Tackett was arrested in September 2006 and has been incarcerated since that time.  By the date of sentencing, Tackett will have served approximately fifteen months in prison.  Based on his cooperation during the investigation and his truthful testimony during the Scott Harris trial, the United States will make a 5K1.1 motion for substantial assistance, and will recommend that Tackett be sentenced to time served.

Tackett's loss amount is $249,083, calculated as follows:

| | | |
|---|---|---|
| 4/1/1999 bogus check from RMG to Cyclone | | $97,095 |
| 6/1/1999 bogus check from RMG to Cyclone | + | $53,540 |
| 1/24/2001 bogus invoice from Cyclone to SCS | + | $40,048 |
| 9/18/2001 bogus invoice from Cyclone to SCS | + | $58,400 |
| | | $249,083 |

Tackett's final offense level, not including a potential reduction under 5K1.1, is 17, calculated as follows:

| | | |
|---|---|---|
| 2B1.1(a)(2)–Base offense level | | 6 |
| 2B1.1(b)(1)(G)–Loss more than $200,000, less than $400,000 | + | 12 |
| 2S1.1(b)(2)(B)–Money Laundering, 18 USC 1956 | + | 2 |
| 3E1.1(a) & (b) | - | 3 |
| | | 17 |

## IV.    Curtis Hopkins

The United States has no objections to the Probation Officer's calculation of Hopkins' offense level or criminal history.  Pursuant to the plea agreement reached with Hopkins, the United States will recommend a sentence of two years of probation, and restitution of $51,288.60, payable at or before the time of sentencing.

Hopkins' actual loss amount is $122,285.44.  Hopkins' supplier charged him $34 per ton for coal.  There was testimony during trial that Hopkins received a discount from his supplier because of other business dealings.  Another coal broker told the United States that the same supplier offered him the same coal for $37 per ton, which was the market price at the time.  Based on the testimony at trial, the standard industry mark up is $2 to $3 per ton, and $5 is extreme.  Even with a $5 mark up, Hopkins should have offered his coal to FoL for no more than $42 per ton.  Instead he sold his coal to FoL for $46 per ton, and, as explained above, paid Kalen Watkins roughly $4 per ton in kickbacks while Watkins was still employed at FoL.

Hopkins shipped 30,571.36 tons of coal to FoL.  If Hopkins is given the benefit of the doubt and allowed a $5 per ton mark up, he was still overcharging FoL by $4 per ton.

30,571.36 tons  X  $4 overcharge per ton  =  $122,285.44 loss suffered by FoL

Hopkins' final offense level is 15, calculated as follows:

| | | |
|---|---|---|
| 2B1.1(a)(2)–Base offense level | | 6 |
| 2B1.1(b)(1)(F)--Loss more than $120,000, less than $200,000 | + | 10 |
| 3C1.1--Obstructing Justice, Guilty Plea to 18 USC 1512 | + | 2 |
| 3E1.1(a) & (b) | - | 3 |
| | | 15 |

The United States will honor its plea agreement with Hopkins, but acknowledges that the agreed sentence is below the applicable Guideline range, and the restitution Hopkins will pay will not fully reflect the entire loss suffered by FoL as a result of the fraud.

November 27, 2007

Respectfully submitted,
DAVID L. HUBER
United States Attorney

_/s/ David Weiser_____
David Weiser
James Lesousky
Assistant U.S. Attorneys
510 West Broadway, 10th Floor
Louisville, Kentucky  40202
(502) 582-5911

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Sentencing Memorandum was served by electronic notice to counsel of record on this 27th day of November, 2007.


  /s/ David Weiser
David Weiser
Assistant U.S. Attorney