## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT BOWLING GREEN

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                                      CRIMINAL ACTION NO.  1:06-CR-48
                                                  *Filed Electronically*

KENNETH SCOTT HARRIS, et. al.                               DEFENDANT

### UNITED STATES' SENTENCING MEMORANDUM FOR
### KENNETH SCOTT HARRIS AND RONALD POLLOCK

The United States of America, by counsel, submits the following sentencing

memorandum for Kenneth Scott Harris and Ronald Pollock.

### FACTS

Kalen Watkins was Fruit of the Loom's (FoL) Environmental Director.  As FoL's

Environmental Director, Watkins was entrusted to determine which environmental projects

needed to be completed, to set budgets for those projects, to hire contractors to complete projects,

and to approve invoices submitted by those contractors for payment.

In 1998 or 1999, Watkins devised a scheme to defraud FoL.  Although Watkins' scheme

was simple to understand, its execution was sophisticated and complex in its breadth.  FoL relied

on Watkins' environmental expertise.  Watkins' determined that he could set FoL's

environmental budget far higher than necessary to complete the required work.  He also

determined that he could hire his friends and co-conspirators to do the environmental work for

FoL, and because he approved FoL's budget and invoices for payment, he could tell his co-

conspirators how much to bill, even if the project cost far less to complete.

In return for FoL business, Watkins' friends and colleagues kicked back significant portions of their profits to Watkins. In addition to approving inflated invoices for payment, Watkins also approved invoices for payment even though he knew that absolutely no work was performed. People who refused Watkins' offer to participate in the scheme were cut off from future FoL projects until they agreed to participate.

### Terry Pool Rejected Watkins' Proposal to be a Silent Partner in SCS

In 1998, Terry Pool (Pool) owned a company called SCS Environmental (SCS) that had a few minor projects with FoL. Watkins approached Pool with a business proposal. Watkins told Pool that FoL had budgeted millions to perform upcoming environmental projects, but that the projects would cost much less to actually complete. Watkins offered to hire SCS to do the work on those projects, and told Pool that SCS could bill the budget, resulting in large, windfall profits. In return, Watkins wanted to be a silent partner in SCS, thus allowing him to share SCS's profits, and asked that SCS hire Watkins' mistress, Laura Wells. Pool rejected Watkins' offer, and for several years SCS received no further FoL business.

### Scott Harris Accepted Watkins' Proposal to be a Silent Partner in RMG

In mid-1998, Scott Harris (Harris) formed Risk Management Group (RMG). During a February 2006 interview with the FBI, Harris explained that he had known Watkins for some time, and that in 1998 Watkins encouraged Harris to leave his employer and to start his own environmental consulting company, and that Watkins promised to send Harris FoL business. Whereas Pool had rejected Watkins' proposal to defraud FoL, Harris accepted. Harris started RMG and hired Laura Wells, and Watkins became a silent partner in RMG.

As promised, Watkins hired RMG to perform several environmental projects for FoL. RMG performed the work, but with Watkins' approval, overbilled for the work it performed. In 1999 alone, RMG received over $1,000,000 from FoL[1] and Watkins and Harris shared over $300,000 in profits from their fraudulent scheme.

### Scott Harris Paid Kickbacks to Kalen Watkins in Return for FoL Business

Tyrone Tackett (Tackett) owned Cyclone, a heavy equipment company. Tackett testified at trial that in 1999 Watkins and Harris approached him about using Cyclone to launder money generated from their fraudulent scheme, and Tackett agreed. By laundering funds through Cyclone, the source and ownership of the funds were disguised, and RMG could also fraudulently claim payments to Cyclone as business expenses on its tax returns.[2] On April 1, 1999, RMG gave Cyclone a check for $97,095. Tackett testified that he performed no work in return for this check. Tackett deposited the check and gave approximately $85,000 back to Watkins. On June 1, 1999, RMG gave Cyclone another check for $53,540, purportedly for work on FoL's Rockingham, North Carolina jobsite. Tackett testified that he did no work for this check, and that he has never stepped foot in Rockingham, North Carolina. Tackett testified that he gave Harris all of the proceeds of this check.

---

[1]  In 1999 RMG received approximately $50,000 for work performed on behalf of clients other than FoL.

[2]  Harris had over $100,000 in cash deposits in his personal bank account in 1999, and withdrew an additional $130,000 from RMG's account in late 1999, when RMG closed its doors. In addition, in June 1999 alone Harris paid $68,893.44 to GMAC Mortgage, and sent $60,000 to Merrill Lynch. Harris also sent $94,000 to Ameritrade in April 2000. RMG's 1999 tax return nonetheless reported an operating loss of approximately $24,000, and Harris claimed approximately $50,000 in income on his 1999 personal tax return.

Ron Pollock owned Pollock & Associates (P&A).  Pollock testified that in 1999 Harris and Watkins approached him about using P&A to launder money generated by their fraudulent scheme, and Pollock agreed.  On April 20, 1999, Harris gave Pollock a $74,912 RMG check made payable to P&A.  Pollock testified that he had done between $5,000 and $7,000 of actual work for RMG, and the remainder of the check was completely unearned.  Pollock testified that he deposited the check and withdrew portions of the funds each week in cash, and gave that cash to Harris.  On June 23, 1999, P&A received another $8,400 check from RMG.  Pollock testified that he did no work in return for this check, and that he cashed the check and gave the funds back to Harris.  On June 28, 1999, P&A received another check from RMG, for $9,250.  Pollock testified that he did no work in return for this check, and that he cashed the check and gave the funds back to Harris.  Pollock's bank records reflect cashed checks and cash withdrawals that correspond directly with large cash deposits made in Harris' personal bank account.

Harris also paid Watkins other kickbacks in addition to Watkins' share of the bogus checks RMG laundered through Cyclone and P&A.  In late 1999, Harris' wife, Deborah Harris, purchased two cashier's checks, one for $18,650, and the other for $30,000, made payable to Watkins' wife, Lori Watkins.  These checks were additional kickbacks to Watkins.  During his February 2006 interview with the FBI, and during a second interview in April 2006, Harris was unable to provide any explanation for these payments.  During the February 2006 interview, Harris called his wife and allowed the FBI to listen to the telephone call.  Deborah Harris did not know that the FBI was monitoring the telephone call, and when Scott Harris asked her about the two payments to Lori Watkins, she continually asked her husband if something was wrong, was unable to explain the payments, and finally asked her husband "are they coming to get us?"

At trial, Watkins and Harris both claimed that these checks represented Harris' purchase of a lifetime lease to hunt and fish on Watkins' farm.  Their story was demonstrably false, because Harris was unable to explain the purpose of the checks when he was interviewed in February 2006 and again in April 2006, and there was absolutely no documentation of this alleged lifetime lease.[3]  Moreover, this alleged purchase of a lifetime lease made no sense because Harris' wife did not work, and in late 1999 RMG was closing its doors, and Harris was preparing to move his family over 700 miles away to Oklahoma so he could obtain his PhD at Oklahoma State University.

During his February 2006 interview, Harris also admitted that on more than twenty (20) but less than fifty (50) occasions, he paid Watkins $1,000 to $2,000 in cash kickbacks.[4]

### The Fraud Continued When Harris Moved to Oklahoma

Harris and Watkins continued their scheme to defraud FoL even after Harris closed RMG and moved to Oklahoma.  On September 7, 2001, Harris received an email from Watkins titled "lotto," in which Watkins instructed Harris to bill FoL $28,561 for purchase order 186542.  In the email, Watkins listed the following 3 line items:

7–ex

10k, csh

11561s

---

[3] Harris testified on direct that "I'm a paperwork person." (Harris trans., Sept. 4, 2007, p. 64). Harris was subsequently asked on cross if he had anything documenting his alleged lifetime lease. Harris bluffed and said his attorney had the written agreement, but when Harris' bluff was called and he was asked to produce the agreement, he had nothing.  (Harris trans., Sept. 4, 2007, p. 121-24).

[4] The Court has previously held Kalen Watkins responsible for $35,000 in loss as a result of these kickbacks.

During his February 2006 interview with the FBI, Harris confessed that this email outlined a continuing scheme to defraud FoL.  Harris explained that the project was expected to cost $7,000 in expenses (7-ex), that Kalen would receive a $10,000 cash kickback (10k, csh), and the remaining $11,561 would go to Scott (11561s).  In fact, Harris submitted a $28,771 invoice to FoL for purchase order 186542, and Harris explained that he paid Watkins his cash kickback in December 2001, when Harris and his family returned to Bowling Green for the Christmas holiday.  Watkins personal bank records reflect a $7,880 cash deposit on December 21, 2001.

### Pollock and Watkins Defrauded FoL

In addition to laundering funds for Watkins and Harris through the receipt of RMG checks, as described above, Pollock also defrauded FoL by submitting inflated and bogus invoices directly to FoL.  Watkins knew these invoices were inflated or completely bogus, but he approved them for payment and shared the profits with Pollock.  During a proffer, Pollock admitted that he received payment for $160,675 in completely bogus invoices submitted to FoL, and that he shared the profits from these invoices with Watkins.  Pollock also admitted that he received an additional $15,000 from FoL for invoices that were fraudulently inflated.  These overpayments were also shared with Watkins.

### SENTENCING RECOMMENDATIONS

I.    **Kenneth Scott Harris**

Harris participated in over $300,000 of fraud over a period of several years, suborned perjury by calling Kalen Watkins to testify, and repeatedly committed perjury himself while on the stand.  Accordingly, the United States respectfully requests that Harris receive a mid-range Guideline sentence of 36 months imprisonment.

Harris' loss amount is $341,618, calculated as follows:

| | | |
|---|---|---|
| 4/1/1999 bogus RMG payment to Cyclone | | $97,095 |
| 6/1/1999 bogus RMG payment to Cyclone | + | $53,540 |
| 4/27/1999 bogus RMG payment to Pollock (-$7,000 for work Pollock actually performed) | + | $67,912 |
| 6/23/1999 bogus RMG payment to Pollock | + | $8,400 |
| 6/28/1999 bogus RMG payment to Pollock | + | $9,250 |
| 2 kickback cashier's checks purchased by Debbie Harris and made payable to Lori Watkins | + | $48,650 |
| thirty five (35) $1,000 cash kickbacks to Watkins from Harris | + | $35,000[5] |
| Lotto email fraud ($28,771 paid - $7,000 expenses) | + | $21,771 |
| **TOTAL** | | **$341,618** |

The Probation Officer determined Harris offense level is 20, calculated as follows:

| | | |
|---|---|---|
| 2B1.1(a)(2) (base offense level) | | 6 |
| 2B1.1(b)(1)(G) ($200,000 < Loss < $400,000) | + | 12 |
| 3C1.1 (obstruction of justice--committing and suborning perjury) | + | 2 |
| **FINAL OFFENSE LEVEL** | | **20** |

---

[5]   At Kalen Watkins' sentencing hearing, the United States sought a loss of $52,500 attributable to this conduct, consistent with the PSR, but the Court held Watkins responsible for $35,000 in loss.  In respect for the Court's ruling, the United States seeks only $35,000 in loss for Harris for the exact same conduct.  The Court held Watkins fully responsible for all of the other loss amounts listed in the Harris loss calculation.

The United States concurs with the Probation Officer's findings.  A two level enhancement for obstruction is clearly appropriate, based on Harris' subornation of perjury by calling Kalen Watkins to the stand,[6] and Harris perjuring himself by repeatedly lying during both the suppression hearing and trial.[7]

The following statements are but a few examples of the lies Harris told under oath during the August 27, 2007, suppression hearing and when he testified at trial on Sept. 4, 2007:

- Discussing his February 2006 interview, Harris testified during the suppression hearing that "I said I wanted to leave and they said I couldn't." (Aug. 27, 2007, Harris trans, p. 8). Harris repeated the lie during the trial: "Agent Glenn instructed me that I was not free to leave the room." (Sept. 4, 2007, Harris trans., p. 20).

- Discussing his February 2006 interview, Harris testified  that "Dick Glenn told me that if I wanted a lawyer that he would arrest me." (Aug. 27, 2007, Harris trans., p. 9).

- Discussing his February 2006 interview, Harris falsely testified that AUSA Weiser "told me I needed to be thinking about my kids, because after they took my wife my kids are going to be standing there wondering where Mommy went." (Aug. 27, 2007, Harris trans, p. 12). "They were trying to force me to confess to something I didn't do and threatening my wife and kids to get me to do it." (Sept. 4, 2007, Harris trans., p. 29).

- Denying his February 2006 confession, Harris testified that during the February 2006 interview he told S.A. Glenn "very clearly" that he was not involved in any kind of kickback scheme or anything like that. (Sept. 4, 2007, Harris trans., p. 26).  "I told them I never gave Kalen Watkins a kickback of any kind." Id., p. 63.

- Harris testified at trial that he told S.A. Glenn and AUSA Weiser in February 2006 that the kickback checks from Deborah Harris to Lori Watkins were "for my hunting lease up

---

[6] Harris' counsel was told numerous times that Kalen Watkins had offered to testify against Harris in return for a plea deal for Watkins' lover and co-defendant, Laura Wells.

[7] Although multiple instances of obstruction do not result in multiple two level enhancements under section 3C1.1, multiple attempts to obstruct justice, as we have with Harris, do support an upward departure under sections 5K2.0, 5K2.7, and 5K2.9 of the Guidelines.  See United States v. Pulley, 922 F.2d 1283, 1289 (6th Cir. 1991) (affirming an upward departure in addition to a two level enhancement under 3C1.1 where the defendant committed perjury and convinced another witness to refute his confession, and convinced other witnesses to commit perjury).

there at Kalen's farm." (Sept. 4, 2007, Harris trans., p. 30-31). "I believe I made that very clear." Id., p. 142.

- Harris denied his February 2006 confession that he paid Watkins multiple kickbacks in 1999. (Sept. 4, 2007, Harris trans., p. 64). Harris claimed he never accepted any kickbacks, never stole any money from anyone, did not participate in a scheme to falsify invoices, and did not confess in February 2006. Id., p. 110-11.

- Contrary to Ron Pollock's testimony, guilty plea, and bank records that verify Pollock's testimony, Harris claimed he never received any cash from Ron Pollock. (Sept. 4, 2007, Harris trans., p. 100). "It's my testimony that he didn't give me any money." Id., p. 117. "I did not pay him for any work that he failed to do. He did that work and I paid him exactly what I owed him." Id., p. 118.

- Contrary to Tyrone Tackett's testimony and guilty plea, Harris claimed Tackett actually performed a job for RMG in Rockingham, North Carolina. (Sept. 4, 2007, Harris trans., p. 108). "He earned every penny of that money." Id., p. 143.

- Harris denied confessing about the lotto email scheme. (Sept. 4, 2007, Harris trans., p. 141).

### A 36 Month Sentence is Appropriate Under the 18 U.S.C. § 3553(a) Sentencing Factors

The sentencing factors listed in Title 18, United States Code, Section 3553(a) all support a 36 month sentence.

Under section 3553(a)(1), the sentence must reflect "the nature and circumstances of the offense and the history and characteristics of the defendant." The nature and circumstances of the offense reveal that over the course of several years Harris willfully and actively participated in a six-figure scheme to defraud FoL. Harris submitted fraudulently inflated invoices to FoL for payment, and shared the illegal proceeds with his co-defendants, including Watkins, Tackett and Pollock. The fraud continued even after Harris closed his company moved his family several hundred miles to Oklahoma.

Harris' characteristics were revealed for all to see through his long term participation in this crime and in his attempts, during both the suppression hearing and during his trial testimony, to cover up his crime through outrageous lies and accusations.  Harris has a doctorate degree, and had both the means and the ability to provide for his family through honest, hard work.  Instead, he chose to defraud FoL of over $340,000 over the course of several years.  Despite his initial inclination to at least partially accept responsibility for his crimes, he later decided to attempt to cover them up and deny responsibility.  Based on both the circumstances of the offense and Harris' lack of character, a 36 month sentence is appropriate.

Section 3553(a)(2)(A) states that the sentence should "reflect the seriousness of the offense, promote respect for the law, and provide just punishment."  Harris participated in a $340,000 fraud over the course of several years, continuing to defraud FoL even after he moved to Oklahoma.  A 36 month sentence will accomplish all of section 3553(a)(2)(A)'s goals.

Section 3553(a)(2)(B) and (C) state that the sentence should afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant.  A 36 month sentence will accomplish both of these goals.

Finally, section 3553(a)(6) states that the desire for the sentence imposed to avoid unwarranted sentencing disparities among similarly situated defendants.  A 36 month sentence is squarely within the appropriate Guideline range, and a Guideline sentence will prevent undesirable sentencing disparities with similarly situated defendants.  Moreover, a 36 month sentence will avoid unwarranted sentencing disparities with Harris' co-defendants.

Harris' crime and conduct falls between Kalen Watkins and Tyrone Tackett.  Harris was involved in $341,000 of fraud with Watkins and Tackett.  Kalen Watkins was involved in

slightly over $1,000,000 in fraud, but like Harris, he obstructed justice, did not accept responsibility for his crimes, and did not cooperate in the investigation.  Like Harris, Watkins had a criminal history category I, and received a 121 month sentence.  Tyrone Tackett participated in $249,083 in fraud, but unlike Harris, Tackett accepted responsibility for his crimes, cooperated with the investigation, and did not obstruct justice.  Tackett was a criminal history category I, and received a 15 month sentence.  Accordingly, a 36 month sentence falls between Watkins' and Tackett's sentences, and avoids sentencing disparities between Harris and similarly situated defendants, and between Harris and his co-defendants.

## II.    Ronald Pollock

The United States has no objections to the Probation Officer's determination of Pollock's offense level and criminal history.  Pollock's loss amount is $261,237, calculated as follows:

| | | |
|---|---|---|
| Bogus invoices submitted to FoL | | $160,675 |
| Partially bogus invoices submitted to FoL | + | $15,000 |
| 4/27/1999 bogus check from RMG to Pollock | + | $74,912 |
| 6/23/1999 bogus check from RMG to Pollock | + | $8,400 |
| 6/28/1999 bogus check from RMG to Pollock | + | $9,250 |
| SUBTOTAL | | $268,237 |
| MINUS work actually performed for 4/27/1999 RMG check | - | $7,000 |
| **TOTAL** | | **$261,237**[8] |

---

[8] In the plea agreement, the United States stated that the loss amount was $193,675.  This number was calculated incorrectly.

Pollock's offense level should be 17, but the United States will honor its plea agreement and recommend a sentence at offense level 15, prior to a 5K1.1 adjustment.  The proper offense level should be calculated as follows:

| | | |
|---|---|---|
| 2B1.1(a)(2)–Base offense level | | 6 |
| 2B1.1(b)(1)(F) ($120,000 < Loss < $200,000) | + | 10 |
| *OR* | | |
| 2B1.1(b)(1)(G) ($200,000 < Loss < $400,000) | + | 12 |
| 2S1.1(b)(2)(B) (Money Laundering, 18 USC 1956) | + | 2 |
| 3E1.1(a) & (b) | - | 3 |

**FINAL OFFENSE LEVEL**                                         **15 or 17**

At sentencing the United States will make a 5K1.1 motion for substantial assistance, based on both Pollock's substantial assistance and cooperation during his interviews prior to trial, and his truthful testimony during trial.

January 10, 2008

                              Respectfully submitted,

                              DAVID L. HUBER
                              United States Attorney


                              _/s/ David Weiser_____
                              David Weiser
                              James Lesousky
                              Assistant U.S. Attorneys
                              510 West Broadway, 10th Floor
                              Louisville, Kentucky  40202
                              (502) 582-5911

-12-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Sentencing Memorandum was served by electronic notice to counsel of record on this 10th day of January, 2008.

/s/ David Weiser
David Weiser
Assistant U.S. Attorney
